David G. PERKINS and Thomas Y. Perkins, Appellants,

v.

Bob BERGLAND, Secretary of Agriculture, U. S. Department of Agriculture, John R. McGuire, Chief, Forest Service, William B. Hurst, Regional Forester, James Kimball, Don Bolander, Supervisor of the Prescott National Forest, Appellees.

No. 78–3659.

United States Court of Appeals, Ninth Circuit.

Nov. 21, 1979.

Robert K. Best, Sacramento, Cal., for appellants.

Carl Strass, Dept. of Justice, Washington, D. C., for appellees.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and HOFFMAN *, District Judge.

GOODWIN, Circuit Judge:

Two brothers, who grazed cattle on public land, sued the Department of Agriculture to challenge a reduction in their grazing permits. They appeal a summary judgment for the government.

Thomas and David Perkins hold permits entitling each of them to graze cattle within the Prescott National Forest. The permits are issued by the United States Forest Service, an arm of the Department of Agriculture, as authorized by 16 U.S.C. § 580*l*

---

* The Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

(1976). In 1972, the Forest Supervisor, on recommendation of the local District Ranger, reduced Thomas's permit from 517 to 250 head of cattle (subsequently corrected to 266). The following year, the Supervisor similarly reduced David's permit from 158 to 50 head (later corrected to 58).

The agency based the reduction decisions on its finding that the public land involved had been damaged by overgrazing. The decisions were finally upheld by the Secretary of Agriculture in 1977. After exhausting administrative remedies, Thomas and David brought separate actions in district court, seeking judicial review and an injunction against enforcement of the reductions. The cases were consolidated in district court, and are considered together on appeal.

## I

■ The district court correctly rejected the Perkins' first line of attack: that the reductions were so drastic as to constitute revocations of their grazing permits. The Perkins brothers argued that revocation requires application of the criteria found in the regulation governing revocation and suspension, 36 C.F.R. § 231.6 (1977).[1] The Forest Service admittedly did not apply those criteria here. However, the district court held, and we agree, that the permits were not in fact suspended or revoked.

The Forest Service reduced the allowable use of the lands for reasons unrelated to the punitive purpose of 36 C.F.R. § 231.6. That regulation allows revocation only in the case of misconduct by a grazing permittee, and in no way relates to allotment reductions necessitated by changed conditions of the range resulting from causes other than permittee misconduct. However drastic an effect on their livelihood the reductions here may have had, the permits were not revoked. Thus, the district court was right in rejecting the revocation theory.

## II

The Perkins brothers argued, in the alternative, that the Secretary's decisions, if not "revocations", were nonetheless subject to judicial review. The government responded, and the district court agreed, that further review was unavailable because the decisions were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1976).[2] This conclusion is challenged on two grounds: (1) the reduction decisions are not so committed; or (2), if so committed, the decisions are nevertheless subject to limited judicial review for clear arbitrariness, irrationality, or abuse of discretion.

Both sides purport to rely on the "law to apply" test established in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), for determining when judicial review is precluded under section 701(a)(2). The Secretary also relies on a series of post-*Overton Park* cases in this circuit[3] to support the

---

1. This regulation, entitled "Revocation and suspension of grazing permits", reads as follows:

    "The Chief, Forest Service and Regional Foresters are authorized to revoke or suspend in whole or in part, and Forest Supervisors are authorized to revoke up to 20 percent, or suspend in whole or in part, term grazing permits or grazing agreements on all National Forest System lands and on other lands under Forest Service control if:

    "(a) The permittee does not comply with the provisions and requirements in the grazing permit, the regulations of the Secretary of Agriculture on which the permit is based, or instructions issued by Forest officers; and

    "(b) The permittee knowingly and willfully makes a false statement or representation in grazing application or amendments thereto; or

    "(c) The permittee violates or does not comply with, Federal laws or regulations or State laws relating to protection of air, water, soil and vegetation, fish and wildlife, and other environmental values when exercising the grazing use authorized by the permit."

2. The Administrative Procedure Act provides in part: "This chapter [on judicial review] applies * * * except to the extent that * * * agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

3. *Nelson v. Andrus,* 591 F.2d 1265 (9th Cir. 1978); *City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.), *cert. denied sub nom. Pacific Gas & Electric Co. v. Santa Clara,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1979); *Strickland v. Morton,* 519 F.2d 467 (9th Cir. 1975); *Ness*

district court's determination that the reduction decisions are immune from review. Neither party, however, appears to have called to the trial court's attention the new legislation enacted during the time this controversy was pending before the agency. Thus, the trial court never passed upon the effect of a comprehensive public lands statute which now governs the reviewability issue. Federal Land Policy and Management Act of 1976 (FLPMA), Pub.L.No. 94–579, 90 Stat. 2743, codified at 43 U.S.C. §§ 1701 et seq. (1976).[4]

FLPMA empowers the Secretaries of the Interior and Agriculture, each of whom grants grazing privileges on public lands within departmental jurisdictions, to incorporate in grazing permits and leases "such terms and conditions as [the Secretary] deems appropriate for management of the * * * lands." 43 U.S.C. § 1752(e). The same section further provides that the Secretary must specify in the agreement "the

numbers of animals to be grazed * * * and that * * * [the Secretary] may reexamine the condition of the range at any time and, if he finds on reexamination that the condition of the range requires adjustment in the amount or other aspect of grazing use, that the permittee or lessee shall adjust his use to the extent the Secretary concerned deems necessary."[5]

█ If we were confronted with the quoted language alone, we would have to consider the government's argument that the Secretary's discretion is so broad in determining grazing capacity—necessarily exercised in accord with expert judgments—as to preclude all judicial review under Overton Park. Elsewhere, however, FLPMA explicitly provides that "it is the policy of the United States that * * * judicial review of public land adjudication decisions be provided by law." 43 U.S.C. § 1701(a)(6) (1976).[6] This declaration of

---

*Investment Corp. v. United States Dept. of Agriculture,* 512 F.2d 706 (9th Cir. 1975).

**4.** This legislation is presented only obliquely on appeal. The government has countered appellants' argument that provisions of other legislation (also presented for the first time in this court) supply "law to apply" by saying that the provisions and policies of FLPMA now override those of earlier public land enactments.

**5.** While this precise language does not appear in the permits involved here, which antedated FLPMA, the permits explicitly provided that:

"* * * The number and kind of livestock * * * permitted to graze are as follows, unless modified by the Forest Service in the Bill for Collection: * * *.

"* * * Each year prior to the beginning of the grazing season, the Forest Supervisor will send the permittee a Bill for Collection specifying, for the current year, the kind and number of animals allowed to graze * * *."

"* * * The number of livestock * * may be adjusted when determined by the Forest Supervisor in charge to be needed for resource protection. Except in extreme emergencies where resource conditions are being seriously affected by livestock use, or other factors * * *, notice of a scheduled reduction of numbers of livestock * * * will be given one (1) full year before a reduction in permitted numbers * * * becomes effective."

**6.** Section 1701(b) of Title 43 provides that the thirteen policies enumerated in section 1701(a) "shall become effective only as specific authority for their implementation is enacted by this Act or by subsequent legislation * * *." We do not understand by this language that Congress intended the courts to ignore the policy expressly favoring judicial review. We note that the expressed policy favoring judicial review survived the congressional conference committee in the face of vocal opposition by the Department of the Interior, the other agency authorized to permit grazing on federal land. In a letter to the House Committee, Jack Horton, then Assistant Secretary of the Interior, stated that the draft then under consideration was "almost completely unacceptable to the Administration." H.R.Rep.No. 94–1163, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 6175, 6216. One of the "major problem areas" was specifically identified in this way: "The policy as to judicial review * * * is so broad as to clog the courts with cases involving individuals who cannot get what they want under the law." *Id.* at 6217.

In addition, the former Bureau of Land Management director (Interior Department), writing about FLPMA after its passage, expressed concern that the policy provision would change well-established precedent if discretionary decisions were subject to court review, thereby resulting in substantial delays in governmental decisionmaking, and undermining executive agency independence. Landstrom, *An Operational View of the BLM Organic Act* [FLPMA], 54 Denver L.J. 455, 458 (1977).

policy at the outset of FLPMA removes any doubt Congress might otherwise have allowed to obscure the reviewability of grazing reduction decisions made subsequent to the law's enactment. Since 1976, the Secretary's decision is reviewable.

## III

The remaining issue thus requires us to define the scope of review appropriate to the Secretary's decisions here.

Appellants assert for the first time in this court that certain sections of the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), 16 U.S.C. §§ 528 et seq., supply standards which a court can apply on judicial review to the highly technical assessment of the proper carrying capacity of grazing land.[7] These statutory expressions give the appellants scant support. It must be presumed,

at least initially, that those so-called standards were properly considered by the agency. These sections of MUSYA (16 U.S.C. §§ 528, 529, 531)[8] contain the most general clauses and phrases. For example, the agency is "directed" in section 529 to administer the national forests "for multiple use[9] and sustained yield of the several products and services obtained therefrom," with "due consideration [to] be given to the relative values of the various resources in particular areas." This language, partially defined in section 531 in such terms as "that [which] will best meet the needs of the American people" and "making the most judicious use of the land", can hardly be considered concrete limits upon agency discretion. Rather, it is language which "breathe[s] discretion at every pore." *Strickland v. Morton,* 519 F.2d 467, 469 (9th Cir. 1975). What appellants really seem to

The congressional committee knew how to exempt certain agency action from judicial review within the Act. It added a section to the final bill explicitly forbidding judicial review of the adequacy of certain reports required by the Act. 90 Stat. 2743, § 701(i), 43 U.S.C. § 1701 note. There is no similar prohibition with respect to individual grazing decisions.

7. Because the Perkinses failed to suggest in district court that MUSYA provided "law to apply", we consider that argument here only in connection with our duty to define the proper scope of review on remand.

8. These sections of Title 16 read as follows:
"It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. * * *" Section 528.
"The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. In the administration of the national forests due consideration shall be given to the relative values of the various resources in particular areas. The establishment and maintenance of areas of wilderness are consistent with the purposes and provisions of sections 528 to 531 of this title." Section 529.
"As used in sections 528 to 531 of this title, the following terms shall have the following meanings:
"(a) 'Multiple use' means: The management of all the various renewable surface resources of the national forests so that they

are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to confirm to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.
"(b) 'Sustained yield of the several products and services' means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." Section 531.

9. Interestingly, the multiple use concept reappears throughout FLPMA, 43 U.S.C. §§ 1701(a)(7), 1702(c), 1712(c)(1), 1732(a). This language came into the legislation even though the select commission which recommended the enactment of comprehensive public land legislation which eventually materialized as FLPMA regarded the hortatory "multiple use" expression as meaning "all things to all people." Conklin, *PLLRC* [Public Land Law Review Commission] *Revisited—A Potpourri of Memories,* 54 Denver L.J. 445, 448 (1977).

be saying when they rely on the multiple-use legislation is that they do not agree with the Secretary on how best to administer the forest land on which their cattle graze. While this disagreement is understandable, the courts are not at liberty to break the tie by choosing one theory of range management as superior to another.

■ Thus, we conclude that only very narrow review is appropriate here. The district court should ascertain whether the agency's factual findings as to range conditions and carrying capacity are arbitrary and capricious. 5 U.S.C. § 706(2)(A).[10] If not, the matter ends there.[11] In making that inquiry, the court may consider the Perkins brothers' contention that the methods utilized by the Forest Service in determining capacity were irrational.[12] But their charge that the agency decision was "unrelated to reality" sheds no light on the subject. We find nothing in the statutes authorizing courts to choose between battling experts on the definition of "reality". Consequently, the trial court must refrain from entering that fray if it turns out that the appellants' position would require a choice between experts.

The judgment is vacated and the case is remanded to the district court for the very limited factual review available under the "arbitrary and capricious" standard.

Neither party is to recover costs in this court.

---

10. Although the Perkinses apparently received hearings within the agency's review process, there is no statutory requirement for a hearing. Thus, the substantial-evidence test of section 706(2)(E) does not apply. *Stickelman v. United States,* 563 F.2d 413, 417 (9th Cir. 1977). Instead, section 706(2)(A) supplies the appropriate standard for the factual review. *Id.*

11. Appellants also employ the routine charge that the agency abused its discretion. However, to overturn an administrative action on the ground of abuse of discretion, the challenger must show some evidence of abuse. We detect none here.

12. To prove that the agency employed "irrational" methods for calculating carrying capacity, a contesting party must show that there is virtually no evidence in the record to support the agency's methodology in gathering and evaluating the data.