SIERRA CLUB; Wisconsin Forest Conservation Task Force; and Wisconsin Audubon Council, Inc., Plaintiffs,

v.

Floyd J. MARITA, as Regional Forester of the Eastern Region of the Forest Services, United States Department of Agriculture; F. Dale Robertson as Chief of the Forest Services; and Jack A. Blackwell as Forest Supervisor of the Chequamegon National Forest, Defendants.

Civ. A. No. 90–C–0989.

United States District Court, E.D. Wisconsin.

March 7, 1994.

**1318**

Walter Kuhlmann, Boardman, Suhr, Curry & Field, Madison, WI, for plaintiffs.

Wells D. Burgess and Louise Milkman, U.S. Dept. of Justice—Environment & Natural Resources Div.—Gen. Litigation Section, Washington, DC, and Mel S. Johnson, Asst. U.S. Atty., Milwaukee, WI, for defendants.

## DECISION AND ORDER

REYNOLDS, District Judge.

In this action, the plaintiffs, three conservation groups, claim that the United States Forest Service ("the Service") violated various environmental statutes and regulations by failing to consider basic principles of ecology in developing a management plan for the Chequamegon National Forest. Both sides have filed motions for summary judgment. For reasons set forth below, plaintiffs' motion will be denied and defendants' motion granted.

This action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Jurisdiction in this court is based upon 28 U.S.C. § 1331.

### I. Overview and Procedural History

The Chequamegon (She-WA-me-gon) National Forest, encompassing almost 845,000 acres in northwestern Wisconsin, is managed according to the terms of a "Land and Resource Management Plan" ("plan" or "forest plan") issued by the Service. Development of the current plan, which covers the period from 1986 to 1995, began in the early 1980s

under the direction of the Chequamegon Forest Supervisor. A draft version of the plan was formally issued to the public on March 29, 1985, along with a draft environmental impact statement comparing the environmental impact of the draft plan to that of several alternative plans. There followed, pursuant to 16 U.S.C. § 1604(d), a period of public comment, as a result of which the draft plan was modified in certain respects.

On August 11, 1986, the Service's Regional Forester for the Eastern Region ("Regional Forester"), which includes the Chequamegon, issued the final plan, the final environmental impact statement ("FEIS"), and a Record of Decision explaining why the plan had been approved. The plan then was challenged in an administrative appeal by various citizens' groups, including the instant plaintiffs. On January 31, 1990, Service Chief F. Dale Robertson ("the Chief") issued a decision affirming the plan in pertinent part.

Plaintiffs Sierra Club, Wisconsin Forest Conservation Task Force, and Wisconsin Audubon Council, Inc., are organizations dedicated to the enjoyment, study, and conservation of forests and other natural resources. Members of each organization use the Chequamegon for scientific, professional and recreational purposes, which allegedly will be adversely affected by implementation of the plan. (Compl. at ¶¶ 5–7; May 22, 1992 George Hall Aff.; May 21, 1992 Sharon Clark Gaskill Aff.; May 22, 1992 William Alverson Aff.; May 20, 1992 Allen Hillery Aff.; May 20, 1992 Rolland Kiel Aff.; May 12, 1992 Fred Lesher Aff.; May 8, 1992 Samuel Robbins Aff.; May 7, 1992 Thomas Syverud Aff.; May 22, 1992 Donald Waller Aff.[1]) The problem with the forest plan, plaintiffs claim, is that the Service ignored important scientific principles in developing it and, as a result, failed to consider its effect on "biological diversity," thereby violating the following statutes and various regulations associated with them: the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., which requires a "hard look" at the environmental consequences of federal action; the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq., which governs the development of forest plans and requires that they provide for biological diversity; and the Multiple–Use Sustained-Yield Act ("MUSYA"), 16 U.S.C. § 528 et seq., which bars impairment of the productivity of the land.

Because plaintiffs' claims under these statutes are brought pursuant to the APA, the challenged agency action may be set aside only if shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). With this standard in mind, the court will address the merits of plaintiffs' claim, after first reviewing their standing to challenge the Chequamegon forest plan and the "ripeness" of the controversy.

## II. Standing and Ripeness

### A. Background

The plan, a document the size of a suburban telephone book, establishes fairly specific objectives for recreational and commercial use of the Chequamegon over the period of a decade and prescribes management practices necessary to achieve those objectives and to fulfill other statutory requirements. The objectives for recreational use are quantified in terms of the amount of time visitors to the forest spend in various recreational environments or activities ("semi-primitive nonmotorized recreation," "semi-primitive motorized recreation," "roaded natural recreation," and hunting and fishing). (Plan at 8, Tbl. IV–1.)[2] The objective for timber harvesting is set at 70 million "board feet" of timber per year, allocated among six categories of timber type, four harvest methods, and dozens of defined geographical areas. (Plan at 8, Tbl. IV–1; App. C at 1–16, 36–44.)

---

**1.** The affidavits describe in great detail how the members' use of the forest would be affected by implementation of the forest plan.

**2.** For example, the plan provides that the forest will have the capacity for visitors to spend a total of 70,000 "recreation visitor days" per year in semi-primitive motorized recreation. (Plan at 8, Table IV–1.)

To accomplish these objectives, the plan sets forth a number of management prescriptions to be implemented over the course of ten years, specifying (among other things) the mileage of roads and trails to be constructed or reconstructed, the acreage of "permanent wildlife openings" and "habitat improvements" to be constructed, and the acreage of trees to be harvested, planted, and "regenerated." (Plan at 8–9, Tbl. IV–1.) In addition, each of the dozens of geographical areas into which the forest plan divides the forest is assigned one of 16 "Management Prescriptions" representing different combinations of management practices·and recreational environments. (*Id.* at 104–192; App. C at 1–35.)[3]

Finally, the plan sets forth a number of "forest-wide standards" that guide implementation of the plan's management prescriptions. (Plan, Ch. IV at 21–100.) The guidelines range from general policy statements, concerning, for example, the construction of trails and recreation areas, (*Id.*, Ch. IV at 26–28), to quite specific instructions concerning timber harvesting methods and wildlife "habitat management." (*Id.*, Ch. IV at 39–66, 79–88.)

B. Analysis

■■■■ A case or controversy for purposes of Article III arises where an injury, the invasion of a "concrete" and legally cognizable interest, has occurred or is "imminent," is traceable to the defendant's action, and is redressable by a decision in the plaintiff's favor. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). It is not disputed that the alleged injury in this case concerns a concrete, legally cognizable interest—personal and professional enjoyment of the Chequamegon environment—nor that plaintiffs and their members are "among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Defendants contend, however, that plaintiffs' injury is not imminent because the source of the anticipated injury is not the plan itself

but implementation of the plan, which must await the development of site-specific projects (such as individual timber sales) that will be subject to their own environmental analyses. *See* 40 C.F.R. §§ 1502.14(d), 1508.9(b). Thus, defendants insist, though plaintiffs will have standing to challenge such projects as they are developed, they do not have standing to challenge the plan as a whole.

The court disagrees. Contrary to defendants' assertion, the plan does not "merely state[ ] guidelines and parameters to be followed in the event a project is undertaken." (Apr. 27, 1992 Def. Br. at 45.) While the plan certainly includes such guidelines and parameters, it also sets forth, as indicated in the previous section, a whole array of exceedingly specific management "prescriptions" that are in no sense conditional or optional. Consider the following regulations:

> Plans guide all natural resource management activities and establish management standards and guidelines for the National Forest System. They determine resource management practices, levels of resource productions and management, and the availability and suitability of lands for resource management.
>
> \* \* \* \* \* \*
>
> Plan implementation. As soon as practicable after approval of the plan, the Forest Supervisor shall ensure that, subject to valid existing rights, all outstanding and future permits contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan. Subsequent administrative activities affecting such lands, including budget proposals, shall be based on the plan.

36 C.F.R. §§ 219.1(b), § 219.10(d). Similarly, the forest plan makes clear that *it* determines how the forest will be managed; site-specific projects are "designed to carry out the Forest Plan direction." (Plan, Ch. V at 4.)

---

**3.** The forest is not found in a single block but consists of three noncontiguous areas inter-

spersed with a number of rural communities.

Thus, while the plan does not itself spell out the numerous site-specific projects necessary to its implementation, it clearly does require that such projects be undertaken, and it dictates their cumulative effect, which, after all, is what plaintiffs are concerned about. Moreover, barring amendment or revision (*see* 36 C.F.R. §§ 219.10(f), (g)), neither of which is said to be in the offing, the plan is certain to be implemented in its current form. Thus, because the current plan mandates, in quite specific terms, the very management activity that will ultimately cause plaintiffs' injury, the fact that the Service has yet actually to *inflict* the injury through the development of site-specific projects does not render the injury "conjectural" or "speculative" and therefore does not deprive plaintiffs of standing to challenge the plan. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1516 (9th Cir.1992). *See also Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1221–22 (7th Cir.1982).

▆▆▆ Plaintiffs also have standing to challenge the adequacy of the FEIS. Indeed, such a challenge may be brought even absent a showing that injury is imminent and redressable; it is enough that the alleged injury concerns a concrete and legally cognizable interest that "could" be impaired as a result of the agency's failure to prepare the FEIS properly. *Defenders of Wildlife,* —— U.S. at —— n. 7, 112 S.Ct. at 2142 n. 7. In this case, plaintiffs contend, if the Service had considered basic ecological principles in its environmental analysis it might have sought to avoid or mitigate plan prescriptions that contribute to excessive forest fragmentation, the source of plaintiffs' injury. That gives plaintiffs standing to challenge the FEIS.

▆▆▆ Repackaging their position on standing, defendants also contend that since site-specific projects having yet to be developed, the dispute over the forest plan is not "ripe" for adjudication. Here defendants rely principally upon *Lujan v. National Wildlife Federation,* 497 U.S. 871, 890, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), which held that a general category of actions and decisions by the Bureau of Land Management was not

"agency action" under the APA, 5 U.S.C. § 702, and therefore was not ripe for review, because the actions and decisions, though related as a factual matter, had not been formally grouped into a "completed universe." Absent such formal grouping by the agency or by statute, the court held, a category of actions and decisions that may constitute a "program" in the abstract "cannot be laid before the courts for wholesale correction under the APA." 497 U.S. at 893, 110 S.Ct. at 3191.

Unlike the actions and decisions at issue in *National Wildlife Federation,* however, the collection of decisions that make up the forest plan *is* formally treated as a single agency action. *See:* 36 C.F.R. § 219 Subpart A; 36 C.F.R. § 219.10(d) (providing for administrative appeal of "the Regional Forester's decision to approve a forest plan"). Thus, notwithstanding the need to develop site-specific projects, the forest plan is ripe for review. *Idaho Conservation League,* 956 F.2d at 1518–19.

The court now turns to the merits of plaintiffs' claim.

### III. Biological Diversity

### A. Statutory, Regulatory Background

▆▆▆ The NFMA, enacted in 1976, was designed to provide a "comprehensive framework for the development and implementation of [forest] management plans" consistent "with the principles of multiple-use and sustained-yield" that had been set forth in MUSYA. S.Rep. No. 94–893, 94th Cong., 2d Sess. at 10 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6662, 6671. Section 6(g) of the NFMA directs the Secretary of Agriculture to promulgate regulations governing the development of management plans. 16 U.S.C. § 1604(g). The regulations are to include, among other things, guidelines that:

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species simi-

lar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B).

The required regulations, promulgated in 1979 and revised in 1982, include two sets of guidelines corresponding to the diversity language of Section 6(g)(3)(B). The first set concerns the place of biological diversity in forest planning generally:

Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26.

The second set of diversity guidelines is addressed to the actual content of management plans:

Management prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities, including endemic and desirable naturalized plant and animal species, so that it is at least as great as that which would be expected in a natural forest and the diversity of tree species similar to that existing in the planning area. Reductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives.

36 C.F.R. § 219.27(g). For purposes of these regulations, "diversity" means "the distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3.

Closely related to the diversity provisions (perhaps designed to implement them) are regulations concerning protection of the "Fish and Wildlife Resource." 36 C.F.R. § 219.19. These regulations require, first, that the Service manage "[f]ish and wildlife habitat ... to maintain viable populations of existing native and desired non-native vertebrate species." *Id.* Accordingly,

habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

*Id.* The second requirement of the fish and wildlife regulations is that the Service estimate and monitor the effect of forest management on the populations of certain "management indicator species." 219.19(a)(1)–(7). These species, which may be plant or animal, vertebrate or invertebrate, must include, "where appropriate," representatives of the forest's threatened and endangered species, species with "special habitat needs," common game species, "non-game species of special interest," and species whose "population changes are believed to indicate the effects of management activities on other species ... or on water quality." 36 C.F.R. § 219.-19(a)(1).

In sum, the NFMA and associated regulations create three requirements related to biological diversity: that forest planning provide for diversity of plant and animal communities, that viable populations of vertebrate species be maintained, and that the effect of management prescriptions on populations of management indicator species be monitored. Defendants' method of addressing these requirements is set forth below, followed by a discussion of the ecological principles that plaintiffs claim defendants ignored.

### B. The Service's Approach to Biological Diversity

### 1. Analysis of Preferred Vegetative Composition

The Service claims it satisfied the NFMA's diversity provisions by conducting the required population viability and indicator species analyses (discussed below) and by conducting a separate analysis of "vegetative diversity." The latter analysis was based on

the Service's assumption that overall biological diversity is mainly a function of "diversity of habitats," and on its further assumption that "forest vegetation is the most important determinant of" habitat. (FEIS, App. D at 1; Ch. II at 86.) Vegetative diversity was found to depend principally on the following variables: the variety of different tree (or timber) species and age-classes, including "old growth," occurring throughout the forest; the acreage of "permanent upland openings" maintained; and the choice of harvest method. (FEIS, App. D at 1, 9–10; Ch. II at 29, 33, 37, 41, 45, 49, 53, 57, 61–62.) The first two of these variables were considered important because it was believed that different tree species and age-classes, as well as openings in the forest, provide habitat for distinct groups of animals. (*Id.*, App. D at 5, App. F at 41.) The main significance of harvest method, according to the Service, is that "uneven-aged silviculture" or "selection cutting" is easier on species tolerant of shade, whereas "even-aged silviculture" or "clearcutting" tends to benefit species intolerant of shade. (*Id.*, Ch. IV at 8–13.)

To each of these variables, save that relating to harvest method, the Service assigned a value or values that it believed would collectively maximize the "diversity of wildlife" in the forest. (*Id.*, App. D at 9–10, Tbl. D–2.) The Service concluded that the optimal variety of tree species would be achieved if the forest were divided equally among three groups of tree species: pioneer species (mainly Aspen), Northern Hardwoods, and Conifers. (*Id.*, App. F at 41; App. D at 9–10, Tbl. D–2.) For the age-class variable, it was believed that the optimal value would result if tree populations were distributed fairly evenly among different generations. (*Id.*, App. D at 8; 9–10, Tbl. D–2.) Finally, the Service concluded that permanent upland openings would optimally account for about five percent of the forest. (*Id.*, App. D at 10, Tbl. D–2.)

Having thus determined the values that would achieve a "preferred vegetative composition" for wildlife diversity, the Service incorporated these values into a "Diversity Benchmark," which in turn was incorporated into an alternative forest plan emphasizing wildlife diversity, Alternative F. (*Id.*, App. B at 168–169; 170, Tbl. B–1.) Eight other alternative plans were developed as well (lettered A through E and G through I), each with a different management emphasis. (*Id.*, App. B at 177–205.) By comparing the "vegetative composition" resulting from each of these plans with the composition reflected in Alternative F, the Service sought to predict each alternative's effect on wildlife diversity. (*Id.*, App. D at 12, Tbl. D–3; App. D at 13; Ch. II at 29, 33, 37, 41, 45, 49, 53, 57, 61–62.) The harvest method emphasized by each alternative also was considered in this comparison (as were, to a lesser extent, each alternative's provisions for marsh "development" and stream and lake "improvements"). (*Id.*; Ch. IV at 8–13; Ch. II at 86–91.)

## 2. Management Indicator Species and Population Viability

Pursuant to 36 C.F.R. § 219.19, the Service selected management indicator species and determined their minimal viable populations as follows. The habitat associated with each of the Chequamegon's more than 300 vertebrates was identified, resulting in 25 different habitats, which in turn were grouped into ten "indicator communities": aquatic, wetland, permanent opening, shrub/saplings, deciduous upland, deciduous upland old growth, coniferous upland, mixed upland, coniferous lowland, and deciduous lowland. (Aug. 27, 1992 Def. Br., Ex. A at 7.) For each indicator community, at least one species was selected for monitoring, and each selected species satisfied at least one of the following criteria: it was highly sensitive to habitat change, was "threatened" or "endangered," was "commonly fished, hunted, or trapped," was a non-game species of "special interest," had "special habitat needs," or was a "true indicator" of the "effect of management activities on other species of selected major biological communities or on water quality." (*Id.*, Ex. A at 2, 3, 18, Tbl. 13.)

To determine each indicator species' minimum viable population, the Service started with the assumption that, for any species, a population of 50 is minimally necessary to maintain "short-term fitness." (*Id.*, Ex. B at 6.) That number was then adjusted to take

into account various factors unique to each species, including the "[v]ariation from equal contribution of all breeding adults to future generations," the male-to-female ratio, generational overlapping, and fluctuation in birth and death rates. (*Id.*, Ex. B at 6–7.) These adjustments resulted in an estimate of the species' minimum effective or viable population. (*Id.*)

Finally, the Service determined the amount of each indicator species' habitat that would be available under each alternative forest plan and divided that amount by the amount of habitat necessary to support a single member or pair of the species. (FEIS, Ch. II at 130, Tbl. II–45.) This calculation, according to the FEIS, resulted in an estimate of the total population that each alternative plan could support. (*Id.*) By comparing that population estimate to each species' minimum viable population, the Service was able to determine whether each alternative would support a minimum viable population of each species, and it found that to be the case. (*Id.*, Ch. IV at 76–82.)

### C. Plaintiffs' Objection to the Service's Approach

#### 1. Conservation Biology

Plaintiffs challenge the Service's approach to diversity largely on the basis that it ignored the ecological consequences of "forest fragmentation," as predicted by the science of conservation biology. This science demonstrates, plaintiffs say, that biological diversity of a particular region depends on several interrelated factors bearing upon the quality of the region's habitats. Prominent among these factors are the size of the habitats, or "patch size," and the extent of disturbance within the habitats. (IV Admin.Rec. at 1329–35.) The science holds that a habitat must be sufficiently large and undisturbed that "minimum viable populations of sensitive species [can remain or recolonize within the habitat] after a catastrophic disturbance." (*Id.* at 1332.) Based upon the size of the area typically affected by such disturbances, plaintiffs estimate that a patch size of 50,000 acres is minimally necessary. (*Id.* at 1333.)

Another factor that conservation biology deems relevant is the degree of accessibility between similar geographical habitats. The science predicts that as similar habitats become increasingly isolated from each other, biological diversity declines because organisms cannot survive disturbances in one habitat by migrating to another. (*Id.* at 1343–55.) This is known as the theory of "island biogeography," so-named because it is derived from the study of biological diversity on oceanic islands.[4] (*Id.* at 1343.) The same theory has been applied to purely terrestrial habitats, where, for example, "islands" of old-growth forest are surrounded by a "sea" of young forest, thereby isolating the organisms dependent on old-growth habitat. (IV Admin.Rec. at 1343–46; Jan. 3, 1992 Pl. Statement of Facts at 24–27.)

The third factor plaintiffs identify as crucial to conservation biology is the extent to which a habitat is penetrated by adverse external forces, or "edge effects," from adjacent habitats. (IV Admin.Rec. 1355–75.) Edge effects would include, for example, the invasion of an old-growth forest by plants and animals (deer are of particular concern) from a surrounding younger forest. (*Id.* at 1357–58, 1373.) If the invasion extends, say, a quarter-mile into the old-growth forest, and the entire habitat is only a half-mile wide, the organisms dependent on the old-growth forest may be effectively deprived of their habitat. (*Id.* at 1356.) Thus, the presence of edge effects is believed to be pertinent to determining how large a habitat must be.

Plaintiffs contend that conservation biology and the associated concepts of "patch dynamics," "island biogeography," and "edge effects," represent well-accepted scientific theory. The theory is based, according to plaintiffs' submissions to the Service, mainly on scientific literature dating from the 1970s (*Id.* at 1330–1332, 1337–38, 1340–41, 1343–46, 1349–64, 1366–73, 1375), though it relies as well on scholarship of the 1960s. (*Id.* at 1337, 1343–44.) The bibliography plaintiffs submitted to the Service includes a number of sources from the 1970s and early 1980s

---

4. Because both island biogeography and conservation biology stress the importance of patch size, the two terms often are used interchangeably.

discussing, in terms of conservation biology, the biological significance of a forest habitat's size, internal fragmentation, isolation from other habitats, and edge effects. (Jan. 3, 1992 Pl. Statement of Facts at 23–34; IV Admin.Rec. at 1451–59, 1485–90.)[5] Several of these sources confirm the applicability of island biogeography to continental forest reserves. (Jan. 3, 1992 Pl. Statement of Facts at 23–34; IV Admin.Rec. at 1455, 1456, 1458, 1459, 1490.)[6] Indeed, according to United States Fish and Wildlife Service official Hal Salwasser: "Island Biogeography theory and empirical knowledge are the foundation of the role of pattern diversity in National Forest Management." (IV Admin.Rec. at 1354.)

Plaintiffs' general position was endorsed before the Service by thirteen experts on biological diversity, they being of the unanimous opinion that such diversity cannot be maintained in the Chequamegon unless a meaningful portion of it is reserved for large tracts (i.e., at least 30,000 to 50,000 acres) of relatively undisturbed forest. (IV Admin.Rec. at 1460–84.) As one expert put it:

> Supporting large reserves these days is like supporting motherhood. The over-

whelming consensus among ecologists and biogeographers is "the larger the better." (*Id.* at 1479.)

Accordingly, plaintiffs proposed on administrative appeal that the Chequamegon plan be modified to provide for the establishment of two "Diversity Maintenance Areas" ("DMAs"), each consisting of about 50,000 acres. (IV Admin.Rec. at 1433–34.) No timber harvesting or road construction other than that previously planned would take place on the DMAs, according to plaintiffs' proposal, and other management activities would be restricted as well. (*Id.* at 1435, 1580–81 (quoting draft of final forest plan, Ch. IV at 94–95).) Plaintiffs had made a similar proposal during the public comment period. (Dec. 31, 1991 Kuhlmann Aff., Ex. A at 26.)

#### 2. The Service's Response to Plaintiffs' Objection

During the public comment period on the draft forest plan and environmental impact statement, plaintiffs met with the Chequamegon Forest Supervisor's staff to discuss,

---

**5.** Examples:

Diamond, J.M., Professor of Physiology at UCLA, discussing "design principles [that] will minimize extinction rates in natural reserves," states:

> A large reserve is better than a small reserve (principle A).... The reserve should generally be divided into as few disjunctive pieces as possible (principle B).... If the available area must be broken into several disjunctive reserves, then these reserves should be as close to each other as possible, if the habitat is homogeneous (principle C).

(Jan. 3, 1992 Pl. Statement of Facts at 25 (quoting Diamond, J.M., "The island dilemma: lessons of modern biogeographic studies for the design of natural preserves," Biological Conservation 7:129–46 (1975) (cited, IV Admin.Rec. at 1485).))

A general text on ecology states:

> ... [R]ecall that different species have different area requirements and that species requiring large areas are often the ones most threatened by man's activities and in need of protection. On these grounds, fragmenting a large reserve into several smaller reserves is a bad rather than a good policy. [Citations omitted.] ... [T]here is the obvious point that some "edge" species, that thrive at the interface between habitats, will prefer several smaller parks ... [C]onversely, edge-intolerant species

will be differentially worse off with several smaller areas, and will be unable to survive once the reserves become too small.

(Jan. 3, 1992 Pl. Statement of Facts at 28 (quoting May, R.M. (ed.), Theoretical Ecology: Principles and Applications (2d ed. 1981) (cited, IV Admin.Rec. at 1487).))

**6.** Examples:

MacArthur, R.H., and Wilson, E.O., state: "Many of the principles [of island biogeography] graphically displayed in the Galapagos Islands and other remote archipelagos apply in lesser or greater degree to all natural habitats." (Jan. 3, 1992 Pl. Statement of Facts at 24 (quoting The Theory of Island Biogeography (1967) (cited, IV Admin.Rec. at 1455).))

Wilcox, B.A., states:

> One of the most profound developments in the application of ecology to biological conservation has been the recognition that virtually all natural habitats or reserves are destined to resemble islands, in that they will eventually become small isolated fragments of formerly much larger continuous natural habitat.

(Jan. 3, 1992 Pl. Statement of Facts at 31 (quoting "Insular ecology and extinction," in Soule, M.E., and Wilcox, B.A. (eds.) Conservation Biology: An Evolutionary–Ecological Perspective (1980) at 95–117 (cited, IV Admin.Rec. at 1458).))

among other topics, the problem of forest fragmentation. (*Id.*, Exs. C, E, F.) As a result of these discussions, the Supervisor's staff decided to set aside "two larger contiguous areas," totalling from 15 to 25 percent of the forest, to be managed in accordance with principles of island biogeography, and provisions to that effect were included in the Supervisor's draft of the final forest plan. (IV Admin.Rec. at 1502, 1532, 1543, 1579–81.)

In comments issued June 20, 1986, the Regional Forester's Technical Review Team criticized these provisions on the ground that they would effectively alter the existing management prescriptions for the affected land without directly saying so. (*Id.* at 1591–92.) The review team therefore recommended that the Forest Supervisor revise his draft in one of the following ways: describe the DMAs as new management areas and include an analysis of their environmental impact in the FEIS; provide that although the DMAs will be used in part for the study of island biogeography, such use will not affect the overall management prescriptions for the land within the DMAs; eliminate any reference to DMAs and provide instead for the study of island biogeography on "existing large areas" of the forest. (*Id.* at 1592.) The review team expressed its preference for the latter alternative. (*Id.*)

At about the same time these comments were issued, the Regional Forester decided that the Chequamegon forest plan should *not* provide for the establishment of DMAs and should make no other specific provision for the study of island biogeography. (*Id.* at 1598–1601.) Instead, whether to "delay activities during forest plan implementation to allow for" such research would be left to the discretion of the Forest Supervisor. (*Id.* at 1599.) The final plan was revised accordingly. In approving the plan, the Regional Forester's Record of Decision notes that "the concept of Island Biogeography is legitimate" but further states:

> The Forest Service studied this issue and found that there is conflicting scientific

evidence regarding the necessity of providing large areas of old growth habitat. Very little research has been done in the Lake States to provide information about the need, amount and distribution of this type of habitat. More information is needed in order to make an informed decision.

\* \* \* \* \* \*

> Any study of the theory of Island Biogeography is a site specific proposal involving National Forest land and is within the authority of the Forest Supervisor to evaluate during Forest Plan implementation. The public will be informed and involved prior to any decision the Forest Supervisor makes to delay activities for the purpose of any study.

(Record of Decision at 9, 19.)

The idea that island biogeography is of uncertain application finds some support in articles presented at a 1982 workshop, the purpose of which was "to identify the current state of information and the future needs to implement the NFMA provision for diversity on national forests." Cooley, J.L. and Cooley, J.H. (eds.), Natural Diversity in Forest Ecosystems: Proceedings of the Workshop ("Workshop") at i (1984).[7] Referring to island biogeography, for example, one article (not written by Service personnel) states:

> Considerable disagreement still exists over the application of these equilibrium principles, first developed for islands, to landscape management. There is, however, no question that landscape patterns greatly affect species diversity of the individual communities on that landscape. An understanding of how specific landscape features (e.g., community size, separation, and the presence of corridors) affect the processes that determine diversity should be a primary research goal.

Christensen, N.L., and Peet, R.K., "Measures of Natural Diversity," Workshop at 54–55 (citations omitted). Similarly, according to an article by one of the 13 experts who supported plaintiffs' position before the Service:

---

**7.** The court has reviewed this work because, though not part of the record, it contains an article that plaintiffs rely upon in support of their position. (IV Admin.Rec. at 1354 (quoting Sal-

wasser, H., J.W. Thomas and F. Samson, "Applying the Diversity Concept to National Forest Management," Workshop at 64.))

Because the degree of insularity created by habitat conversion can vary, it is appropriate to question greatly the applicability of results of studies of true islands to habitat islands.

\* \* \* \* \* \*

[T]he application of conservation biology to the problem of minimum area requirements is still very much in the research and development stage. Nonetheless, responsible management of natural diversity on national forest lands requires that at least these fundamental concepts be considered. However, they should be viewed merely as starting points for more comprehensive management planning efforts than have been required or even technically possible in the past.

Wilcox, B.A., "Concepts in Conservation Biology: Applications in the Management of Biological Diversity," Workshop at 164, 170.

Plaintiffs themselves made essentially the same point during a meeting with the Forest Supervisor's staff. According to a staff member's notes of the meeting, which plaintiffs submitted to the court, the Sierra Club stated:

1. Concept of island biogeography ["IBG"] is relatively new, therefore research data is limited and public awareness is at a low level. Recognize that we are on "thin ice" politically. Technical concept is important, however, and should be incorporated in the Forest Plan.

2. Identifying land for IBG provides a unique opportunity for this type of research in the eastern United States. These areas are very important for the future, and designating land for IBG on the Forest will "set the pace" for the region and the nation....

\* \* \* \* \* \*

5. Need to work toward preserving old growth and long rotation stands now even though research has not identified specific needs. The fiber will still be available for harvest in these areas if the IBG concept is found to be invalid.

(Dec. 31, 1991 Kuhlmann Aff., Ex. F at 2–3.) The newness of island biogeography as applied to forest habitats also was mentioned in a report prepared on behalf of plaintiffs for inclusion in the FEIS:

Now that the problem of fragmentation is recognized, the task becomes that of designing a solution which is biologically appropriate and yet creates minimum conflict with competing resources demands. Much of the research necessary to exactly specify the best solution in terms of size, shape and position of these "Island Biogeographic Management Areas" (IBG Areas) has yet to be completed, but the theory and preliminary results do offer enough evidence to allow guidelines to be developed.

(*Id.*, Ex. H at 5; FEIS, App. A, Attach. A at 4.)

Finally, although the Chequamegon Supervisor originally agreed to the establishment of the DMAs, it is evident that he did so not because he thought application of island biogeography was noncontroversial, but because, on the contrary, he found it controversial but worth exploring. Introducing the theory and the idea of DMAs in his draft of the final forest plan and of the FEIS, he states:

Natural diversity is supported in principle, but sufficient data does not exist to effectively prescribe how natural diversity could be implemented on the Forest. Further research is required to determine how this could be done. For example, research is need to determine how many natural diversity study areas are necessary, and what sizes, shapes and locations of these areas would be most appropriate. Some scientists believe that small blocks of old growth connected to or surrounded by long rotation forests are adequate, while other scientists believe that this arrangement would make it impossible for certain species to exist.

The theory of island biogeography may provide some of the needed information....

\* \* \* \* \* \*

RESEARCH STATUS: Several universities and federal agencies are studying the theory of island biogeography as it applies to mature and old growth habitat in man-

aged forests. Some research on its applicability to northern Wisconsin is expected during the next decade.

(IV Admin.Rec. at 1579, 1586.)

### 3. The Chief's Decision Regarding Diversity

The Chief found that the diversity provisions of the NFMA and associated regulations establish "no additional requirements beyond those identified" in the regulations concerning population viability, management indicator species, and the protection of the habitat of threatened and endangered species. *See* 36 C.F.R. § 219.19. (I Admin.Rec. at 10.) Thus, by complying with these regulations, the Chief concluded, the Regional Forester ensured that the plan provided for biological diversity; no additional inquiry into the principles of conservation biology or anything else, for that matter, was required. (*Id.* at 10–11, 12.)

The Chief separately concluded that the Regional Forester was correct in declining to consider principles of island biogeography. "The island biogeography theory is not new," the Chief found, "but until there is conclusive, empirical evidence that the conclusions, hypotheses, or predictive capabilities for terrestrial ecosystems are valid, it is proper to acknowledge it as untested theory." (*Id.* at 14.) For essentially the same reason, the Chief concluded that the establishment of DMAs was not warranted. (*Id.* at 19, 21.) Though the Chief found that the Service was not obligated to take into account the principles of conservation biology or island biogeography, he adopted the Regional Forester's recommendation that a "committee of experts" be formed to advise the Service on ways of "enhancing diversity" and on the effects of "habitat fragmentation." (*Id.* at 17–18.)

With respect to the management indicator species analysis, the Chief concluded that the FEIS and referenced documents did not adequately explain the criteria used in selecting the species. (*Id.* at 16.) The Regional Forester was therefore directed to "reexamine selection of [the indicator species] and ensure that species sensitive to direct and indirect effects of management practices on the For-

est vegetation types are selected." (*Id.* at 17) The Regional Forester was also directed to "update the analysis of population viability for those species for which he believes viability is a concern." (*Id.*) Though remanding the plan on these points, the Chief affirmed it overall and held that it "remains in effect." (*Id.* at 6.)

### D. Analysis

The Service's assessment of biological diversity is said to have violated not only the NFMA but also NEPA and MUSYA. The latter statute requires that national forests be managed for the "multiple use" of various resources, including "recreation, range, timber, watershed, and wildlife and fish," and that the "periodic output" of such resources be maintained "in perpetuity ... without impairment of the productivity of the land." 16 U.S.C. §§ 528, 529, 531. This language, however, really just amounts to a statement of principle; it offers no guidance on how to assess the particular management activity at issue in this case. *See Perkins v. Bergland,* 608 F.2d 803, 806–7 (9th Cir.1979). Because the NFMA speaks directly to that issue, MUSYA need not be considered further.

NEPA requires that federal agencies take a "hard look" at the significant environmental consequences of proposed projects and disclose the same in a "detailed statement." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348–50, 109 S.Ct. 1835, 1844–46, 104 L.Ed.2d 351 (1989); 42 U.S.C. § 4332. The court finds no reason to treat this requirement separately from the NFMA requirement that forest plans "provide for the diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3). For each statute, the ultimate question, as plaintiffs present it, is the same: What must the Service do to analyze properly the effect of its forest plans on biological diversity? Again, the NFMA deals with that question specifically, whereas NEPA is of far broader application. Nevertheless, the court assumes that the analytical standards developed under NEPA bear upon the quality of the analysis required to address the environmental factors identified in the NFMA.

Under NFMA regulations, forest planning in general must "provide for diversity of plant and animal communities and tree species," and management prescriptions, "where appropriate and to the extent practicable," must "preserve and enhance the diversity of plant and animal communities ... and the diversity of tree species." 36 C.F.R. §§ 219.-26, 219.27(g) (quoted in full, *supra* at 1321–22). Diversity refers to "the distribution and abundance" of the objects in question. 36 C.F.R. § 219.3. Plaintiffs contend that the Service cannot have properly addressed the specified types and elements of diversity without attention to principles of conservation biology, for such principles are known to be critical to the viability of individual species and to an understanding of the structural differences among biological "communities."

Both the NFMA and NEPA require that environmental analyses be founded upon an "integrated" understanding of the major natural and social sciences. 40 C.F.R. § 1502.6; 36 C.F.R. § 219.5(a). In particular, NEPA requires consideration of "ecological" effects, "such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems." 40 C.F.R. § 1508.8. The NFMA, similarly, reveals an ecological bent in its emphasis on diversity of biological "communities." 16 U.S.C. § 1604(g)(3); 36 C.F.R. §§ 219.3, 219.26, 219.27(g). Plaintiffs contend that these explicit and implicit references to ecology, together with the "hard look" principle underlying NEPA, require the Service to take account of the basic ecological principles bearing on biological diversity, prominent among which are the principles of conservation biology.

Plaintiffs have presented the agency and the court with a wealth of authority in support of the theory that principles of conservation biology concerning habitat size, internal fragmentation, edge effects, and island biogeography are relevant to an ecosystem's ability to sustain a diversity of organisms. (*Supra* at 1324–25.) Defendants, furthermore, have offered nothing that directly contradicts the plaintiffs' scientific analysis. Indeed, certain aspects of it have been endorsed by Department of Agriculture offi-

cials. (*Supra* at 1325.) Thus, the court can safely assume that the principles of conservation biology set forth by plaintiffs represent sound ecological theory.

Whatever their theoretical validity, however, considerable uncertainty seems to surround the question of how exactly these principles should be applied. Nowhere in plaintiffs' exhaustive briefs and supporting materials does there appear any suggestion of what methodology the Service should have used to incorporate principles of conservation biology into its planning process. Before the agency, plaintiffs came up with a fairly straightforward application of the science in their proposed creation of two DMAs. (*Supra* at 1325–26.) In this action, however, plaintiffs claim not that the Service was legally obligated to accept that proposal, but that it was obligated to take into account the scientific principles upon which the proposal was based. It is therefore incumbent upon plaintiffs to explain how, precisely, those principles might have been considered; yet no such explanation has been given.

Further, plaintiffs have failed to respond to defendants' assertion that empirical studies of island biogeography have been conducted only in ecosystems differing substantially from the Chequamegon and that such studies therefore do not have equal validity in that forest. (*Supra* at 1326–28.) The idea that there is considerable uncertainty surrounding the proper application of island biogeography to terrestrial habitats finds support in articles written by non-Service scientists, who state, in effect, that while conservation biology is important and should be considered, how to consider it remains an open question. (*Supra* at 1326–28.) This cautious view is not called into question by the Forest Supervisor's original acceptance of the DMA proposal, for he accepted it not as a well-recognized means of applying island biogeography, but as an unprecedented means of studying it. (*Supra* at 1328.) The Supervisor's understanding of the issue was thus consistent with that of his superiors. Both he and they thought further research was needed before island biogeography could be knowledgeably applied to the Chequamegon: to the Supervisor, this was a good

reason for accepting the DMA proposal; to the Regional Forester, a good reason for rejecting it.

Even if plaintiffs had identified some definite manner of applying conservation biology to Chequamegon forest planning, still the court would be reluctant to conclude that the Service acted irrationally in failing to embrace that science. When the NFMA regulations were first proposed in the late 1970s, the committee of scientists charged with reviewing them concluded that the regulations should not specify any particular manner of providing for biological diversity:

> [T]here remains a great deal of room for honest debate on the translation of [the NFMA's biological diversity provision] into management planning requirements and into management programs.

\* \* \* \* \* \*

> [W]e believe it impossible to write regulations which are specific on how this [i.e., providing for biological diversity] is to be done in all regions, in a wide variety of vegetation types, and with a wide range of natural and human factors to consider.

\* \* \* \* \* \*

> No matter how diversity is defined, its measurement is complex. We have studied the question as to whether the regulations should specify use of a diversity index to measure diversity and to monitor effects of management ... Although several mathematical formulations have been used in ecological research, there is no substantial agreement on the meaning or significance of the figures derived. Thus, we believe use of any of the present diversity indices would divert attention from the objective of considering variety throughout the planning process.

44 Fed.Reg. at 26609 (1979). The committee's comments on diversity make no reference to the scientific principles plaintiffs have discussed here. *Id.* at 26599–26630.

_In view of the committee's decision not to prescribe a particular methodology and its failure to mention the principles that plaintiffs claim were by then well established, the court cannot fairly read those principles into the NFMA, particularly since their actual application, as noted above, is subject to debate. The court's unwillingness to impose upon the Service a particular scientific theory reflects not only the experience of the committee of scientists, but also the more general idea that in areas of scientific uncertainty the agency's choice of methodology is entitled to considerable deference. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); *Central Arizona Water Cons. Dist. v. United States Envtl. Protection Agency*, 990 F.2d 1531, 1540 (9th Cir.1993).

■ The court concludes, therefore, that the Service did not act arbitrarily or capriciously, etc., in failing to base its diversity analysis on the principles of conservation biology set forth by plaintiffs.[8] This does not mean, of course, that the Service is relieved of its obligation to study the effect of the forest plan on biological diversity; it only means that, in doing so, the Service was not bound to apply the particular scientific theory that plaintiffs espouse. The court now turns to the distinct problem of whether the Service's chosen methodology rationally addressed the elements of diversity set forth in the NFMA.

To reiterate, the Service began its diversity analysis by determining what mixture of tree species, tree age-classes, and forest openings would maximize the forest's "vegetative diversity." This determination was believed to be important because of the assumption that each of these different categories of vegetation provides or is associated with the habitat of a distinct group of animals, so that as vegetative diversity increases, so does overall biological diversity. (*Supra* at 1322.) The optimal numbers for vegetative diversity were incorporated into an

---

**8.** Note the use of the past tense in this sentence. The court has been presented with information relating to the state of scientific knowledge as of the early 1980s and therefore knows nothing of what may have developed in this area since then.

Thus, the court's conclusions regarding the rationality of defendants' mid–1980s analysis of biological diversity do not necessarily apply to its subsequent analyses.

alternative forest plan, which was then compared with the other alternative plans to determine how vegetative diversity would fare under each of them. (*Supra* at 1323.) Finally, based on assumptions about habitat associations and population density, the Service predicted how each forest plan would affect the populations of various management indicator species. (*Supra* at 1323-24.)

For the most part, aside from criticizing this methodology for its failure to consider conservation biology, plaintiffs do not challenge the assumptions underlying the methodology or the manner in which it was conducted. Plaintiffs express some disagreement with the Service's choices of species and methodology for the analyses of management indicator species and population viability, but they have not explained how those choices were irrational or otherwise legally deficient (again, apart from the fact that they did not incorporate principles of conservation biology.) (Jan. 3, 1992 Pl. Statement of Facts at 52-55, Br. at 127-37.)

Plaintiffs do contend, however, that the Service's analysis failed to examine the effect of the forest plan on diversity of biological "communities," as distinct from diversity of "species." The NFMA and associated regulations plainly require the Service to provide for both forms of diversity (though without explaining the difference between the two). *See* 16 U.S.C. § 1604(g)(3); 36 C.F.R. §§ 219.3, 219.26, 219.27(g) (all quoted in full, *supra* at 1321-22). Yet the Service, plaintiffs insist, really only considered diversity of species: it estimated, for each forest plan, the total acreage of various tree species and age-classes and of forest openings and the aggregate populations of numerous animal species, but made no attempt to survey and study the broader communities in which these species live.

But this criticism does not respond to the central assumptions on which the Service's methodology is based, namely, that diversity of biological communities follows from diversity of habitats and that forested habitats are defined primarily by the species and age-classes of trees they contain. (*Supra* at 1323.) Underlying the Service's management indicator species and population viabili-

ty analyses, similarly, is the assumption that a single species may be representative of an entire community of species. (*Supra* at 1323). Thus, though the Service paid particular attention to individual species of trees and animals, it did so on the assumption that these were predictive or representative of whole communities, an assumption that plaintiffs have not contested.

Again, the Service applied the assumption by determining what mixture of tree species, tree age-classes, and forest openings would be optimal for wildlife diversity; the forest plans were then compared on the basis of their conformity to the optimal prescriptions. (*Supra* at 1323.) The general principles underlying the determination of optimal prescriptions are more or less evident. For the age-class variable, the idea was to achieve a "balance[d]" distribution among several age-classes; for the tree species variable, to distribute total tree acreage evenly among three groups of species, pioneer species, Northern Hardwoods, and Conifers; and for the forest openings variable, to bring the total acreage of forest openings to about five percent of the forest. (*Supra* at 1323.) Plaintiffs have not tried to show that this was an irrational way of applying the Service's assumption about the significance of vegetative diversity.

■ Nonetheless, it is worth noting that although these general principles are evident from the FEIS, the manner in which they were translated into actual numbers is not. The FEIS does not explain, for example, why the Service chose 26 percent as the optimal forest-wide Aspen percentage, or why it chose five percent as the optimal percentage for permanent forest openings. (FEIS, App. D at 9, Tbl. D-2.) If the Service used some particular formulae to arrive at these and other numbers underlying the wildlife diversity benchmark, or at the parameters from which the numbers were selected, one would have hoped that the formulae would be set out in the FEIS or in a referenced document.

Nonetheless, the court does not find that the Service's method of determining the optimal prescriptions was irrational. The failure to describe that method in detail suggests a degree of arbitrariness in the selection of the

optimal prescriptions, but not so much as to undermine the analysis as a whole; some degree of arbitrariness would seem to be inevitable when general principles of management are reduced to numerical guidelines. Further, the principles underlying the selection of optimal prescriptions are identified and explained, and plaintiffs have not attempted to show, nor has the court found, that the prescriptions themselves are at all inconsistent with those principles.

For the foregoing reasons, the court concludes that although the Service was obligated under NEPA, MUSYA, the NFMA, and associated regulations to study and provide for biological diversity in developing the Chequamegon forest plan, its method of doing so was not arbitrary or capricious. Defendants' motion for summary judgment will therefore be granted.

**IT IS THEREFORE ORDERED** that plaintiffs' January 3, 1992 motion for summary judgment is DENIED.

**IT IS FURTHER ORDERED** that defendants' April 27, 1992 motion for summary judgment is GRANTED and this action DISMISSED.